PARENT *v.* HODGES.

BOUNDARIES—LINE FENCE—QUIETING TITLE—EVIDENCE.
In a suit to establish a boundary line and quiet title to land, brought under section 11965, 4 How. Stat. (2d Ed.), evidence examined, and *held*, to establish the existence of the boundary line, as at present occupied by a fence, for more than 20 years, and a decree for complainant is affirmed.

Appeal from Oakland; Smith, J.  Submitted June 8, 1915.  (Docket No. 8.)  Decided September 28, 1915.

Bill by Dollie B. Parent and others against George S. Hodges and others, under section 11965, 4 How. Stat. (2d Ed.) to establish a boundary line and quiet title to land.  From a decree for complainants, defendants appeal.  Affirmed.

*Dondero & Howarth (Pelton & McGee and Peter B. Bromley,* of counsel), for complainants.

*Patterson & Patterson,* for defendants.

MOORE, J. This bill was filed February 25, 1914, for the purpose of establishing a boundary line and quieting title to land. From a decree in accordance with the prayer of the bill of complaint, the case is brought here by appeal.

Virgil M. Rose, on the 17th of July, 1883, conveyed by warranty deed to Mariva Hodges, his daughter, the south 40 acres off from that portion of the N. W. ¼ of section 27, in township 1 N., of range 11 E., in Royal Oak, Mich., lying east of the Detroit and Birmingham plank road, reserving a life estate to Virgil M. Rose. On February 20, 1893, Mr. Rose quitclaimed to Mrs. Hodges the 40 acres above conveyed, thereby releasing his life estate to her. On July 31, 1883, Virgil M. Rose conveyed to Harriet D. Carew, his daughter, all that portion of the N. W. ¼ of section 27, in the township of Royal Oak, Oakland county, Mich., lying east of the Detroit and Birmingham turnpike, containing 122 acres, more or less, except 40 acres off the south side, reserving a life lease. Mr. Rose died in June, 1894. On February 21, 1905, Harriet D. Carew conveyed to her daughters, Dollie B. Parent, Bessie D. McGuire, Kittie H. Wilcox, and Delia M. Hamilton, the premises mentioned in the deed from Virgil M. Rose to Harriet D. Carew. At the time of the death of Mariva Hodges, in November, 1904, she owned the 40 acres, and George S. Hodges, as one of her two heirs, inherited an undivided one-half of the property and received a deed from Helen M. Bertrand, daughter of his brother, Schuyler G. Hodges, deceased, of the other half. The daughters of Mrs. Carew divided the land deeded to them into four equal parts, and the parcel of 24.15 acres immediately north of the Hodges 40 was set off to Dollie B. Parent, the complainant. About 4 years before the bill of complaint was filed, Dollie B. Parent built a house near the fence on the north side of the 40 acres

and on the strip of land now in dispute; the house being valued at $10,000. She claims that, while she was building it, George S. Hodges, the defendant, came to the house and talked with her and made no claim that she was building her house on his land. Mr. Hodges, before this suit was brought, gave the Michelson Land Company a land contract for his 40 acres. This company claimed to own the land north of where Mrs. Parent claims is the boundary fence, including the land upon which Mrs. Parent has built her house.

The complainants claim the right to file this bill of complaint by virtue of section 11965, 4 How. Stat. (2d Ed.). The litigation grows out of conflicting surveys. The complainants claim that a survey made by a Mr. Wilmarth in 1888 is the correct survey, while defendants claim that a survey made by Mr. Russell should control. Complainants also claim that a boundary fence between the Hodges 40 and the land claimed by complainants has existed and been recognized for more than 30 years. As to the fences we quote from the brief of defendants:

"Regarding the north line of the Hodges 40, it appears that the present post and wire fence that is referred to in the record has been built only 7 or 8 years, and that fence has not been built long enough to be used as a boundary fence to establish the ownership of the parties on either side of it. With the exception of this post and wire fence, which was built by Mrs. Parent, the other fences referred to were in existence for many years, and during the lifetime of Virgil M. Rose, when he owned and occupied and controlled the entire property. This post and wire fence was placed on the line run by Surveyor Slater, when he was instructed to run an arbitrary line to include 40 acres from the Wilmarth quarter line, so that occupancy or claim of possession on the part of Mrs. Parent is not sufficient under the statute to base a claim, and I therefore contend that the north line of the property is to be determined and depends upon the location of the quarter section line. Whatever the character or loca-

tion of the old fences that were in existence during the life of Virgil M. Rose, they certainly cannot be construed to be and were not division fences."

In this connection it should not be forgotten that Mr. Rose parted with all his interest in the south 40 acres 21 years before this suit was brought, and died nearly 20 years before.

The case was tried in open court. As to the boundary fence the court found:

"For 35 years or more a fence has existed, renewed when burned or decayed, and upon the same line as the present fence, separating what is called in this case 'the timber lot' from the remainder of the farm. The proofs are so preponderating that I call them conclusive that Mr. Rose supposed this timbered lot contained 40 acres. It did, if the Wilmarth survey is correct. It was called the south 40 acres. * * * All three parties clearly then understood the line of the fence was the division line. * * * It marked the line of the lands the parties understood he was giving to his daughters. The daughters of Mrs. Carew so understood it when they received their deed, and when they so divided it as to give Mrs. Parent this strip in her one-fourth. Mr. Rose, since the quitclaim deed of his life estate to Mrs. Hodges in February, 1893, also Mrs. Carew and her daughters, since the death of Rose in 1894, have been in actual and adverse possession of the land to this fence."

As to the surveys he expressed himself as follows:

"Because the solicitors were so urgent as to these various surveys in the record, they are considered briefly. A certified copy of the field notes of the original United States government survey made in 1816 was presented. One Hervey Parke, of Pontiac, did much surveying in Oakland, after the county was settled, or partially so. He left notes, among which were some of this section. In 1865 the board of supervisors purchased the Parke notes, and subsequent surveyors made records in books from them, which are kept in the county clerk's office. Whether the Parke survey of section 27 was based upon the government survey and monuments, or on the location of the highways, or

whether it was correct, does not appear. County surveyors have since added to these books of record, and surveyors use them. Reuben Russell seems to have made a survey on section 27, based upon the Parke survey, which gave rise to the controversy over the boundary lines. It is claimed the Duffields moved their north line, so as to take in a strip from the Hodges 40, because of the new surveys. Just how much does not appear. I have no confidence in the correctness of the Russell surveys. If the statement purporting to come from Serrell (a surveyor of much experience here, who assisted Russell) is admissible, Russell found no posts or monuments, but set corner posts where he claimed he remembered they had been. It is a part of the record that he made a survey on section 28, and later admitted he had made a mistake of 4 rods. The surveys made by Messrs. Slater and Fisher were based upon the Pontiac records of the Parke and Russell survey. Upon this record I think the Wilmarth survey the more reliable, and as more nearly agreeing with the original government survey. It seems probable that Messrs. Wilmarth and Wilcox did discover what had once been the marking of the quarter section corner by the government surveyors."

The case is well briefed, and it was argued at length orally. The record has more than 200 printed pages. In addition, we have many blueprints and tracings, and copies of field notes. It would do no one any good to set out the record in detail. We think it establishes the fact of the existence of the boundary fence for more than 20 years, and that if the Wilmarth survey is to prevail, and it ought to prevail, the fence is in the proper place.

The decree is affirmed.

BROOKE, C. J., and KUHN, STONE, OSTRANDER, BIRD, and STEERE, JJ., concurred.

The late Justice McALVAY took no part in this decision.